DeMarco•Mitchell, PLLC
Robert T. DeMarco
Michael S. Mitchell
1255 West 15th St., 805
Plano, TX 75075
**T**  972-578-1400
**F**  972-346-6791

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| IN RE: | Case No.:   10-43677 |
| RENÉ H. COUMANS<br>XXX-XX-1816<br>3415 FM 1567 E.<br>Como, TX 75431 | Chapter:   11<br>[JOINT ADMINISTRATION REQUESTED] |
| Debtor(s). | |
| IN RE: | Case No.:   10-43676 |
| MOO TOWN DAIRY, L.L.C.<br>20-4909319<br>3415 FM 1567 E.<br>Como, TX 75431 | Chapter:   11<br>[JOINT ADMINISTRATION REQUESTED]<br><br>HEARING DATE:  October 26, 2010 |
| Debtor(s). | HEARING TIME:   1:30     p.m. |

### AFFIDAVIT OF RENÉ COUMANS IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

BEFORE ME, the undersigned authority, on this day personally appeared RENÉ COUMANS ("Coumans"), who after being duly sworn by me, and upon oath stating that she is over eighteen (18) years of age, of sound mind, and that she is qualified and competent in all respects to make this affidavit and to do so of her own personal knowledge, and further stated:

1.   I, along with Moo Town Dairy, LLC ("Moo Town") comprise the debtor and debtor in possession in the above captioned chapter 11 cases (collectively, the "Debtor"). I am also the sole Managing Member of Moo Town. In this capacity, I am generally familiar with the day to day business operations, books and records, and business and financial affairs of the Debtor.

2.   On October 25, 2010 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code").

3.   The Debtor is currently operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.   There has been no request for the appointment of a trustee or examiner in the case *sub judice*. No official committees have been appointed or designated.

5. In an effort to minimize the impact resulting from the commencement of this chapter 11 bankruptcy case, the Debtor has requested various types of emergency relief through several motions (the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to effectively transition into chapter 11 and minimize the disruption of the business operations.

6. I am familiar with the contents of each of the First Day Motions (including the exhibits and/or schedules attached thereto), and I believe the requests for relief made therein are:

   a. necessary to enable the Debtor to successfully operate in chapter 11 with minimal disruption and loss of productivity and value;

   b. a critical element to achieving a successful reorganization; and

   c. in the best interest of the Debtor's estate and the creditors thereof.

7. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the dairy farm operations and/or learned from my review of relevant documents and information provided to me from other members of the Debtor's management and advisors. If called upon to testify, I could and would testify to the facts set forth herein.

## A. Business History and Operations

8. The Debtor currently owns and operates a dairy farming operation located in Northeast Texas (the "Dairy Farm").

9. I started Belle Vue Dairy (the "Dairy Farm") in November, 1999, when I, along with my ex-spouse, purchased 164 acres of land and a small milk barn in Hopkins County, Texas. A small home adjacent to the original 164 acres was purchased soon thereafter and became my current homestead. The Dairy Farm began operations utilizing the services of only myself and one employee.

10. In June, 2000, the Dairy Farm expanded its operations with the purchase of an additional 100 cattle. I implemented a heifer-raising program during 2000 which allowed the Dairy Farm to begin rearing heifer calves born on the farm for use as milk cows. This program allowed the Dairy Farm to: (1) replenish its herd size internally, thereby minimizing its need to purchase replacement milk cows; and (2) shield it from price fluctuations in the cattle market.

11. The Dairy Farm continued to expand its operations when, in 2002, with its lease of the Friskes Dairy. The lease of the Friskes Dairy facility allowed the Debtor to double its milking cattle herd size in three years to approximately 1000 milking cows in 2005.

12. The growth of the Dairy Farm operations attracted more favorable financing from larger national lenders. In 2004, the Debtor entered into a credit facility with Bank of the West.

13. In early 2005, I was presented with the opportunity to acquire additional land and facilities that would allow for indoor housing of milk cows and for the on-site production of feed. This facility is commonly referred to as the Moo Town Dairy. The Debtor entered into a three year lease-purchase agreement with the assistance of Agriland and Bank of the West to acquire the Moo Town Dairy. At this juncture, the Debtor's herd size increased to approximately 1800 to 1900 cattle housed on three facilities. The original Belle Vue Dairy housed approximately 800 cows, the leased Friskes Dairy about 300, and the newly acquired Moo Town Dairy about 750. The total number of employees rose to about 26.

14. In May, 2006, the Debtor further expanded its operations when it entered into an owner-financed agreement to purchase Sonador Dairy, LLC. This acquisition added 450 acres of land and an additional 700 head of cattle to the operation.

15. By July, 2006, the Debtor was housing approximately 2400 cows on the four facilities described above.

16. In August, 2006, the decision was made to terminate the lease of the Friskes Dairy to allow the Debtor to focus on the operation of the three larger, and more profitable, dairy locations.

17. In 2008, the Debtor created Bokito Farming, LLC ("Bokito"), to provide some separation of the dairy and farming aspects of its business operations. Bokito is currently on title to most, if not all, of the farming equipment.

18. The Debtor currently employs approximately 30 individuals who work with approximately 1900 milking cows, 1000 head of dry cows in pasture, 45 breeding bulls, and approximately 2300 heifer calves of between 1 day and two years of age.

19. The Debtor's business operates 24/7 and is focused upon the care and feeding of dairy cows used in the production of milk for sale to wholesale buyers. The Debtor also generates additional revenue from the sale of certain cattle, primarily bull calves and/or older or non-producing dairy cows (collectively, the "Cull Cows").

20. The Debtor, like other dairy farming operations throughout the country, has faced serious economic challenges in the recent past. Milk prices plummeted to historic lows in 2009. Although milk prices have recovered somewhat during 2010, the pricing of product and the overall cost of production continue to provide challenges for the Dairy Farm's profitability. Adding to the Debtor's financial challenges is the fact that agricultural lenders are markedly less willing and/or able to work with borrowers to extend loan payments in the current economy.

Despite all of the recent economic challenges faced by the Dairy industry, the Debtor has been profitable from day one and throughout the course of its business operations.

21. The case *sub judice* is basically a balance sheet restructuring case and not an operational restructuring case. The Debtor's assets and going concern value are worth less today than they were worth in 2004 when the Debtor most recently restructured its finances with Bank of the West. This case is filed to restructure an overleveraged balance sheet, not to restructure operations *per se*.

### B. Capital Structure

22. Coumans financed all of the equipment[1] used in the operation of the Dairy Farm through CNH Capital America, LLC ("CNH") and Alliance Bank ("Alliance"). While Coumans has multiple obligations due and owing to CNH, Alliance and Coumans consolidated the multiple Alliance debts into a single obligation. The balance due and owing to CNH is approximately $255,000.00. The balance due and owing to Alliance is approximately 35,000.00.

23. The irrigation equipment that is utilized by the Dairy Farm (the "Pivots") were financed by Diversified Financial Services ("DFS"). Coumans is the sole obligor on the DFS obligations, which total, in the aggregate, approximately $99,000.00.

24. Coumans is also the primary obligor on multiple real estate obligations due and owing to Legacy, FLCA ("Legacy"). These obligations were incurred over the years as the Debtor grew and expanded the Dairy Farm operations. Coumans is currently obligated to Legacy in the approximate sum of $2,776.000.00, which obligations are secured by nine (9) separate deeds of trust.

25. It should also be noted that Agriland, PCA ("Agriland") is secured by a 1.5 acre parcel and four mobile homes. The total obligation due and owing to Agriland by Coumans is $20,600.00, of which only $7,180.00 is secured by any real property.

26. The Humphrey obligation is a lease purchase agreement that covers approximately 455 acres. Coumans is obligated to the Humphreys in the approximate principal sum of $1,220,000.00.

27. The Bank of the West ("Secured Lender"), through the credit facility entered into by and between Bank of the West, Coumans, Bokito, and Moo Town accounts for approximately $8,235,000.00 of the Dairy Farm debt. The breakdown of the Secured Lender credit facility, in approximate numbers, is as follows:

---

[1] It should be noted that much, if not all, of the personal property utilized in the dairy farm operation is currently titled in the name of Bokito. In those instances where title was transferred to Bokito, Couman's remained on the obligations and Bokito assumed the obligation.

| | | |
|---|---|---|
| a. | Livestock Acquisition Facility: | $4,835,000.00 |
| b. | Acquisition Feed Line of Credit: | $1,400,000.00 |
| c. | Term Loan: | $2,000,000.00 |

28. The Secured Lender asserts that it is secured by first priority liens on and security interests in substantially all the Dairy Farm's personal property (excluding the farm equipment, but including all cattle, crops, and farm products) and about one-quarter of the real property (collectively, the "Prepetition Collateral").

### C. First Day Motions

- **Debtor's Emergency Motion for Joint Administration**

29. Moo Town and Coumans are affiliates. The Debtor requests their respective bankruptcy cases be jointly administered. I believe the joint administration of the Moo Town and Coumans bankruptcy cases will: (a) ease the administrative burden on this Court and the parties; and (b) prove to be more economical than proceeding without the benefit of joint administration. In short, I believe joint administration is in the best interest of both bankruptcy estates.

- **Debtor's Emergency Motion for Order Authorizing the Interim and Final Use of Cash Collateral**

30. The Debtor has an urgent need for the immediate use of cash collateral pending the final hearing on this Motion. Accordingly, the Debtor seeks to use cash collateral existing on or after the Petition Date, which collateral may be subject to the Secured Lender's Liens. As of the Petition Date, the Debtor does not have sufficient unencumbered cash to fund their business operations.

31. Absent the ability to use cash collateral, the Debtor will not be able to pay for animal feed, insurance, wages, utilities, and other critical operating expenses. Consequently, without access to cash collateral, the Debtor will no longer be able to maintain the Dairy Farm operations and will be forced to liquidate assets. Any liquidation of the Debtor's bankruptcy estate would result in immediate and irreparable harm.

32. The Debtor is not able to obtain sufficient funds for the continued operation of the Dairy Farm other than by obtaining the right to use cash collateral pursuant to section 363 of the Bankruptcy Code.

33. I have formulated a two (2) week budget for the use of cash collateral from the Petition Date (the "Budget"). I believe that the Budget includes all reasonable, necessary and

foreseeable expenses to be incurred in the ordinary course of operating the Dairy Farm. Further, I believe that the use of cash collateral in accordance with the Budget will provide the Debtor with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget. A true and correct copy of the Budget is attached hereto as Exhibit "A" and incorporated herein by this reference.

- **Debtor's Emergency Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services**

34. In connection with the Dairy Farm operation, the Debtor purchases the services and products of certain utility providers ("Utility Providers"). The Debtor pays the Utility Providers, on average, approximately $15,210.00 per month for services rendered. The Debtor has a good payment history with the Utility Providers and believes that it was current in making all payments owed to Utility Providers as of the Petition Date.

35. Preserving utility services on an uninterrupted basis is essential for not only the Dairy Farm operations, but the health and welfare of the cattle. As noted previously, the Dairy Farm operates 24/7. As such, any interruption in any utility will negatively impact the Dairy Farm operations.

- **Debtor's Emergency Motion for Authority to Pay Certain Prepetition Wages Claims**

36. As I indicated previously, the Dairy Farm operates 24/7. As such, any delay in that business operation could have a substantial negative impact on cash flow. The Debtor's employees are critical to ensuring that the Dairy Farm operates continually in order to maximize production. If the Debtor misses payroll, the Debtor's employees will likely cease working and/or quit. By this motion the Debtor is asking for authority to pay any prepetition wage claims.

37. The Debtor contends that as of the Petition Date the Debtor's employees were due about four (4) days of pay. The Debtor's employees are paid current for services rendered on a bi-weekly basis. As such, as of Thursday morning, October 21, 2010, all employees were paid in full for the prior week's worth of services.

38. The total prepetition payroll due and owing for the payroll that will end on November 3, 2010, which is due to be funded on November 4, 2010, is $5,215.80. The forgoing sum reflects an aggregate payroll obligation that is substantially less than the per creditor limits set forth in Section 507(a)(4). The granting of relief under the subject motion is in the best interests of the bankruptcy estates and the creditors of the Debtor.

39. Further, as of the Petition Date, there appear to be a number of payroll checks

from the payroll that ended October 20, 2010, that were not yet cleared from the Debtor bank account. These checks total approximately $3,150.00.

- **Debtor's Emergency Motion for Authorization to Continue its Liability and Other Insurance Programs and to Enter Into Financing Agreements Relative Thereto**

40. The Debtor currently has in place a casualty and general liability insurance policy. Both policies are financed. The Debtor needs to be able to continue to use such financing options during the course of this chapter 11 bankruptcy case so as to prevent dramatic negative impact to its cash flow. Moreover, to the extent a portion of the insurance coverage was provided prepetition, the Debtor must be able to pay for that post-petition to the extent monies are thereon due. The Debtor cannot continue under chapter 11 without such policies in place. It is in the best interest of the creditors and this bankruptcy estate to permit the Debtor's continued financing of its necessary insurance policies.

- **Debtor's Emergency Motion for Authority to Pay Certain Prepetition Tax Claims**

41. In the ordinary course of the Dairy Farm operation, the Debtor is required to hold, in trust for its employees, its portion of certain federal withholding taxes. As it is likely that such taxes are held in trust for the benefit of Texas and/or the Federal Government, there is no reason to bar the Debtor from continuing to pay those obligations on a timely basis, including those taxes incurred and collected pre-petition. Failure to allow the Debtor to pay such taxes would only result in increased priority tax claims. As such, the Debtor needs to be able to continue to pay all tax obligations in a timely fashion. The granting of relief under the subject motion is in the best interests of the bankruptcy estate and the creditors of the Debtor.

Further affiant sayeth not.

_____
René Coumans

Subscribed and sworn to before me the undersigned authority on this 13th day of October, 2010, to certify which witness my hand and seal of office.

_____  10-25-10
Notary public in and for the State of Texas

My Commission Expires:　　　　　　　　　　　　06/21/2014

Carrie Paquin
My Commission Expires
06/21/2014

EXHIBIT "A"

| Budget 10-25-10 through 11-8-10 | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| Belle Vue | | | | |
| | | | | |
| Sprint | 5-Nov | | $515.82 | |
| Waste Management | 1-Nov | | $138.02 | |
| Wood County Electric | 25-Oct | | $8.35 | |
| Payroll | | | $10,000.00 | |
| repairs | | | $2,000.00 | |
| vet | | | $2,000.00 | |
| Feed | | | $62,000.00 | |
| custom work | | | $4,000.00 | |
| fuel | | | $1,000.00 | |
| | | | | $81,662.19 |
| | | | | |
| Moo Town | | | | |
| Payroll | | | $10,000.00 | |
| repairs | | | $2,000.00 | |
| vet | | | $2,000.00 | |
| Feed | | | $45,000.00 | |
| custom work | | | $4,000.00 | |
| Waste Management | 1-Nov | | $138.02 | |
| fuel | | | $1,000.00 | |
| | | | | $64,138.02 |
| | | | | |
| Payroll - Uncleared Checks | | | $3,150.00 | $3,150.00 |
| | | | | |
| | | | | |
| | | | TOTAL | $148,950.21 |

EXHIBIT "A"